**United States District Court**
For the Northern District of California

1

2

3

4

5                      UNITED STATES DISTRICT COURT

6                     NORTHERN DISTRICT OF CALIFORNIA

7

8  RUDOLFO HOPE BERGARA,                    No. C-09-5880 EMC (pr)

9          Petitioner,

10     v.                                   **ORDER DENYING HABEAS PETITION**

11 MICHAEL MARTEL, Warden,

12          Respondent.

13 _____/

14

15                    I.    **INTRODUCTION**

16        Rudolfo Hope Bergara filed this *pro se* action seeking a writ of habeas corpus under 28

17 U.S.C. § 2254.  The matter is now before the Court for consideration of the merits of the habeas

18 petition.  For the reasons discussed below, the petition will be **DENIED**.

19                    II.   **BACKGROUND**

20 A.     The Crimes

21        The California Court of Appeal summarized the evidence of the crimes presented at trial:

22             When Jane Doe was 12 years old, her mother's friend, whom Doe
               considered her aunt, was dating appellant, who was in his 30s.  Doe
23             later wrote, "The [first] day I met you it was like why is he with my
               aunt and not me."  Doe and appellant began a dating relationship that
24             became a sexual relationship.  Sometimes they had sex in appellant's
               mini-van, sometimes they went to appellant's mother's house or his
25             sister's house.  Doe would tell her mother that she was going to soccer
               practice or to a friend's house and then appellant would pick her up
26             around the corner.  Doe did not mind that appellant was so much older
               than she was.  She testified, "I felt like he understood me and that,
27             like, I could talk to him.... It made me feel important and wanted.  It
               made me feel like I was somebody."  Appellant told her that age "was
28             just a number."

In July 2003, Doe became pregnant and had an abortion in August 2003.  Doe told her mother, Peggy A., that Doe's ex-boyfriend was the father of the baby but, because she was only having sex with appellant, she was certain that he was the father.  The abortion caused Doe physical pain and she was sick and in pain for two days.  Appellant was happy when Doe told him that she was pregnant and was upset when he learned of the abortion because he wanted Doe to have the baby.

Doe and appellant continued to spend time together and continued to have unprotected sex.  In October 2003, the Milpitas Police received "a report of suspicious circumstances where an anonymous caller said there was a juvenile female on top of an adult male in a vehicle and both subjects had gone into the house."  In response, the police went to appellant's mother's house.  Appellant's mother told the police that she would check inside the house.  The police did not see appellant. Doe came out of the house and was arrested for being under the influence of a controlled substance.  Doe was very upset and was placed under a 24-hour psychiatric hold.  When interviewed by the police, Doe said that appellant was a "father figure" to her.  The officer testified that Doe told him "that if she could not talk to [appellant], she said what was the point of living."

After Doe's arrest, Ms. A. called appellant and left him a message telling him to stay away from Doe.  Appellant called Ms. A.  Ms. A. testified, "He said something to the effect that he hasn't been around her.... I told him her age.  He knows he could get in trouble.  He said he was sorry.... He doesn't really see her that much."

From December 2003 until August 2004 Ms. A. was serving a jail sentence for felony grand theft and felony elder fraud.  During this time, Doe stayed with her aunt, Annette H., and Doe's grandmother at a motel.  Ms. H. testified that there were some nights that Doe did not come home and she did not know where Doe was.

In February 2004 Doe was taken into custody for assault with a deadly weapon.  Doe was pregnant again, but when she spoke to a police officer who asked her about her relationship with appellant, she denied that it was appellant who had impregnated her.  Doe testified that she felt that she had to protect appellant.  Toward the "middle of the end" of their relationship, appellant would hit her and call her names such as "slut," "whore," and "bitch."  Doe testified that appellant had told her that if the police questioned her about their relationship, "I was supposed to say I didn't know anything."  Doe said that appellant said that if she "told on him" he would hurt her and hurt her family. Although he did not give her any details about this, she believed him and was scared.  Ms. A. testified that she saw bruises on Doe's body.

Doe had an abortion in March 2004.  She felt very sick during the pregnancy.  Medical personnel testified that four seaweed pegs were inserted into Doe's cervix to open it, and that the procedure itself was painful and caused cramping.  There is usually bleeding during the procedure and the patient is placed under a general anesthesia.  Doe testified that since then her body has not been "back to normal."  She

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

said, "my whole body feels different." DNA typing analysis using fetal tissue obtained from this abortion, an oral swab from appellant, and a blood sample from Doe showed that the probability that appellant was the father of the aborted fetus was greater than 99 percent.

Doe testified that sometimes appellant would give her methamphetamine, which was her "drug of choice." Other times she would use methamphetamine on her own or with other friends. Doe testified that appellant also furnished her with alcohol, marijuana, PCP, ecstasy, and "psychedelic mushrooms."

In the spring of 2005, Doe was no longer seeing appellant and told a police officer about their relationship. Several items that Ms. A. had found in Doe's backpack were introduced into evidence at trial. These included greeting cards and letters from appellant to Doe, drafts of messages from Doe to appellant, and photographs. Among the photographs was one taken by Doe of appellant with a hickey on his neck that Doe had just given him.

Appellant's niece testified that when the police came looking for Doe in October 2003 at appellant's mother's house Doe was hiding under a bed and appellant was not at the house. Appellant's sister testified that appellant did not have a key to her house, she kept her house locked and, to her knowledge, appellant was not there when she was not home.

Cal. Ct. App. Opinion, pp. 2-4.

B.    Procedural History

At a jury trial in Santa Clara County Superior Court, Bergara was found guilty of three counts of lewd and lascivious conduct involving substantial sexual conduct with a minor under 14 years of age, *see* Cal. Penal Code §§ 288(a), 1203.066(a)(8); three counts of furnishing a controlled substance to a minor more than four years younger than the defendant, *see* Cal. Penal Code §§ 11380, 11380.1(a)(3); and one count of attempting to dissuade a witness by force or threat of force, *see* Cal. Penal Code § 136.1(c)(1). The jury found true the allegations that Bergara personally inflicted great bodily injury on the victim for two of the lewd and lascivious conduct counts, *see* Cal. Penal Code §§ 667.61(b) and (e), 12022.53, 12022.7, 12022.8. A separate jury found true the allegations that Bergara suffered a prior "strike" conviction that was also a serious felony, *see* Cal. Penal Code §§ 667, 1170.12. On September 29, 2006, Bergara was sentenced to a total of 108 years to life in prison – consecutive indeterminate terms of 30 years to life on counts 1 and 2, plus a determinate term of 48 years and four months in prison.

**United States District Court**
For the Northern District of California

1   Bergara appealed.  The California Court of Appeal reversed the judgment of conviction on

2   one count of furnishing a controlled substance to a minor and reduced the determinate term

3   sentence, and otherwise affirmed the judgment of conviction.  Bergara then petitioned for review.

4   The California Supreme Court granted review pending the decision in *People v. Cross*, 45 Cal. 4th

5   58 (Cal. 2008), which was then under review.  After the *Cross* opinion issued, the California

6   Supreme Court dismissed the petition for review in Bergara's case "[i]n light of the decision in"

7   *Cross*.  Resp. Ex. I.

8   Bergara then filed his federal petition for review.  The Court issued an order to show cause

9   why the petition should not be granted.  Respondent filed an answer.  Petitioner did not file a

10  traverse, and the deadline by which to do so has long passed.  The matter is ready for decision on the

11  merits.

### III.   JURISDICTION AND VENUE

13  This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C.

14  § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction

15  occurred in Santa Clara County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   EXHAUSTION

17  Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

18  either the fact or length of their confinement are required first to exhaust state judicial remedies,

19  either on direct appeal or through collateral proceedings, by presenting the highest state court

20  available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

21  federal court.  *See* 28 U.S.C. § 2254(b), (c).  The parties do not dispute that the state judicial

22  remedies were exhausted for the claims in the petition.

### V.   STANDARD OF REVIEW

24  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

25  custody pursuant to the judgment of a State court only on the ground that he is in custody in

26  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

27  Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new

28  restrictions on federal habeas review.  A petition may not be granted with respect to any claim that

United States District Court
For the Northern District of California

was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.

## VI.   DISCUSSION

A.   The "Great Bodily Injury" Enhancement Claims

　　　1.   *People v. Cross* And Its Impact on This Case

Bergara asserts two claims regarding the sentence enhancements under California Penal Code § 12022.7(a), for personally inflicting great bodily injury.  First, he contends that he was denied due process because the evidence was insufficient to support the great bodily injury enhancement because he did not personally inflict the pregnancy or abortion.   Second, he contends that he was denied due process because the absence of a unanimity instruction allowed the jury to rely on the pregnancy *or the abortion* to find the great bodily injury enhancement allegation true. Before turning to each of those claims, it is necessary to discuss the California Supreme Court's decision in *People v. Cross*, 45 Cal. 4th 58 (Cal. 2008), because that case impacts much of the

United States District Court

For the Northern District of California

1    substantive analysis here.  *Cross* also affects some procedural issues because it was decided after the

2    California Court of Appeal affirmed Bergara's conviction but before the California Supreme Court

3    ruled in his case.

4             a.       Substantive Rulings in *Cross*

5             California Penal Code § 12022.7(a) provides for additional punishment for "[a]ny person

6    who personally inflicts great bodily injury on any person other than an accomplice in the

7    commission of a felony or attempted felony."  "As used in this section, 'great bodily injury' means a

8    significant or substantial physical injury."  Cal. Penal Code § 12022.7(f).

9             In *Cross*, the defendant who had been found guilty of a lewd act on a child challenged the

10   imposition of the § 12022.7(a) enhancement for personal infliction of great bodily injury based on

11   the pregnancy and abortion experienced by his victim.  The California Supreme Court held that a

12   pregnancy without medical complications that resulted from unlawful but nonforcible intercourse

13   could support a finding of great bodily injury under California Penal Code § 12022.7(a).  *See People*

14   *v. Cross*, 45 Cal. 4th 58, 65-66 (Cal. 2008).  The Court explained that the determination of whether

15   the pregnancy was great bodily injury was a question for the jury, and rejected Cross' argument for a

16   categorical rule that "a pregnancy without medical complications that results from nonforcible but

17   unlawful intercourse can never support a finding of great bodily injury."  *Id.* at 65-66.

18           Proof that a victim's bodily injury is "great" – that is, significant or
             substantial within the meaning of section 12022.7 – is commonly
19           established by evidence of the severity of the victim's physical injury,
             the resulting pain, or the medical care required to treat or repair the
20           injury.  (*People v. Harvey* (1992) 7 Cal.App.4th 823, 827-828, 9
             Cal.Rptr.2d 17 [second degree burns requiring treatment for "at least a
21           month"]; *People v. Beltran* (1989) 210 Cal.App.3d 1295, 1308, 258
             Cal.Rptr. 884 [five surgeries, including a bone graft]; *People v.*
22           *Jaramillo*, *supra*, 98 Cal.App.3d at p. 836, 159 Cal.Rptr. 771
             [contusions, swelling, "severe discoloration," and look of anguish on
23           child's face coupled with pain from casual touching of shoulder].)
             Thus, when victims of unlawful sexual conduct experience physical
24           injury and accompanying pain beyond that "ordinarily experienced"
             by victims of like crimes (*People v. Williams* (1981) 115 Cal.App.3d
25           446, 454, 171 Cal.Rptr. 401), such additional, "gratuitous injury" will
             support a finding of great bodily injury.  (*Escobar, supra*, 3 Cal. 4th at
26           p. 746, 12 Cal.Rptr.2d 586, 837 P.2d 1100.)

27           Here, with respect to K.'s pregnancy, the prosecutor urged the jurors
             to rely on their "common experiences" to find that she had suffered
28           great bodily injury by "carrying a baby for 22 weeks or more than 22

                                           6

United States District Court

For the Northern District of California

weeks ... in a 13-year-old body."  There was also testimony that K., who had never given birth before, was carrying a fetus "the size of two-and-a-half softballs."  We need not decide in this case whether every pregnancy resulting from unlawful sexual conduct, forcible or otherwise, will invariably support a factual determination that the victim has suffered a significant or substantial injury, within the language of section 12022.7.  But we conclude that here, based solely on evidence of the pregnancy, the jury could reasonably have found that 13-year-old K. suffered a significant or substantial physical injury.

45 Cal. 4th at 66.

*Cross* also determined that a defendant who impregnated the victim through unlawful but nonforcible intercourse did not have liability for "personally inflicting" the abortion unless he personally performed the abortion.  *See id.* at 66-67.

*Cross* next dealt with a claim that there was an instructional error because the jury had been instructed "that the pregnancy *or* the abortion could be great bodily injury."  *Id.* at 63.  The Court determined that the instruction was error, but "did not violate defendant's state or federal constitutional rights."  *Id.* at 69.  The reasoning that led to this conclusion will be discussed further in connection with the analysis of Bergara's instructional error claim in Section 3, below.

                b.      <u>Procedural Issues Related to *Cross*</u>

The California Court of Appeal decided Bergara's case before the California Supreme Court decided *Cross*.  In fact, the *Cross* case was still pending in the California Supreme Court when Bergara filed his petition for review.  The California Supreme Court granted Bergara's petition for review and deferred further action in the matter pending consideration and disposition of a related issue in *People v. Cross*.  *See* Resp. Ex. H.  A couple of months after it issued the opinion in *Cross*, the California Supreme Court dismissed Bergara's case with this statement: "In light of the decision in *People v. Gary W. Cross* (2008) 45 Cal. 4th 58, review in the above-entitled matter is dismissed. (Cal. Rules of Court, rule 8.528(b)(1).)"  Resp. Ex. I.  California Rule of Court 8.528 describes the various ways that the California Supreme Court may dispose of cases and subsection (b)(1) provides that the California Supreme Court may dismiss review of a case.  The advisory committee comment to the Rule explains that the court formerly was limited to dismissal of reviews that had been improvidently granted review, but in practice, "the court may dismiss review for a variety of other reasons.  For example, after the court decides a 'lead' case, its current practice is to dismiss review

**United States District Court**
For the Northern District of California

1  in any pending companion case (*i.e.*, a 'grant and hold' matter under rule 8.512(c)) that appears

2  correctly decided in light of the lead case and presents no additional issue requiring resolution by the

3  Supreme Court or the Court of Appeal."  Cal. Rule Ct. 8.528 (advisory committee comment).

4  Therefore, the dismissal of review in Bergara's case reasonably may be understood to be a

5  determination by the California Supreme Court that the conclusion of the California Court of Appeal

6  was not inconsistent with the conclusion in *Cross*.[1]

7         2.     <u>Sufficiency of the Evidence on the Great Bodily Injury Enhancements</u>

8            a.     <u>Background</u>

9        Bergara was convicted in counts 1 and 2 of committing lewd and lascivious acts on Jane

10  Doe.  As to each of these counts, the jury also found true the allegation that Bergara had inflicted

11  great bodily injury on Jane Doe based on the fact that the sexual intercourse he had with Jane Doe

12  resulted in a pregnancy and an abortion.

13        Bergara contends that his right to due process was violated because the evidence was

14  insufficient to support the sentence enhancements under California Penal Code § 12022.7(a) for

15  personally inflicting great bodily injury on Jane Doe.  Specifically, he contends that "neither a

16  pregnancy nor a voluntary abortion are synonymous with great bodily injury."  Petition, Docket #1,

17  p. 9 of 24.  His argument is not that there was no evidence of the pregnancies or abortions, and

18  instead is that one who impregnates a female who later has an abortion may have proximately

19  caused the events but that does not mean that he personally inflicted great bodily injury.

20        The California Court of Appeal rejected his argument.  The court summarized the evidence

21  about Jane Doe's pregnancies and abortions:

22          Doe testified that during her pregnancy in 2003, she gained weight and
        vomited blood.  She was in pain during and after the abortion and was
23          sick for two days.  On a scale of one to 10, her pain level was five or
        six.  During her pregnancy in 2004, she was very sick and had pain in

24

---

25       [1]  A determination by the California Supreme Court that a *decision* is correct does not

26  necessarily mean full agreement with the *opinion* of the lower court.  The decision is the ultimate
conclusion (e.g., affirmed or reversed) and the opinion gives the reasons for that conclusion.  *See*

27  *generally* Cal. Const. Art. VI, § 14 ("Decisions of the Supreme Court and courts of appeal that
determine causes shall be in writing with reasons stated."); B. E. Witkin, California Procedure,

28  Appeal, § 778 (5th ed. 2008) ("A distinction must be drawn between an even division on the
*decision* and on the *opinions*").

United States District Court

For the Northern District of California

1  her stomach.  Medical personnel testified that the abortion procedure
2  caused cramping and bleeding and Doe testified that she had
   experienced pain.

3  Cal. Ct. App. Opinion at 7-8.  The court noted that the jury had been instructed that "'great bodily

4  injury'" meant a "'significant or substantial injury;'" that the lewd act itself was not great bodily

5  injury; that "'[m]inor, trivial or moderate injuries inherent in the crime of lewd and lascivious acts'"

6  did not amount to great bodily injury; and that a pregnancy or abortion may constitute great bodily

7  injury.  *Id.*  The California Court of Appeal next reviewed existing state law precedents on the

8  enhancement, and then determined:

9          As to both counts 1 and 2, appellant personally inflicted the injury by
           impregnating Doe during the commission of the lewd act on a child
10         under the age of 14.  The evidence concerning Doe's physical
           manifestations of the pregnancies and the medical procedures she
11         endured to remedy the injury inflicted upon her by appellant support
           the enhancement.  We . . . conclude that pregnancy and abortion may
12         fall within the definition of significant and substantial physical injury.
           Sufficient evidence supported the imposition of those enhancements
13         here.

14  Cal. Ct. App. Opinion at 7-8.

15          b.    <u>Analysis</u>

16          The Due Process Clause "protects the accused against conviction except upon proof beyond

17  a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re*

18  *Winship*, 397 U.S. 358, 364 (1970).  A federal court reviewing collaterally a state court conviction

19  does not determine whether it is satisfied that the evidence established guilt beyond a reasonable

20  doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the

21  prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

22  reasonable doubt.'"  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Payne v. Borg*, 982 F.2d

23  335, 338 (9th Cir. 1992).  Only if no rational trier of fact could have found proof of guilt beyond a

24  reasonable doubt may the writ be granted.  *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.  A

25  federal habeas court applies the standards of *Jackson* with an additional layer of deference under the

26  AEDPA, generally asking whether the state court's decision reflected an unreasonable application of

27  *Jackson* and *Winship* to the facts of the case.  *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir.

28  2005); *see, e.g.*, *McDaniel v. Brown*, 130 S. Ct. 665, 673-74 (2010) (per curiam) (Ninth Circuit erred

**United States District Court**
For the Northern District of California

1    by failing to review all of the evidence in light most favorable to the prosecution when it resolved

2    inconsistencies in testimony in favor of petitioner).

3           Bergara's challenge to the sentence enhancement is largely about legal causation as he

4    argues that one who impregnates a female through unlawful intercourse may have proximately

5    caused, but has not "personally inflicted," great bodily injury for purposes of § 12022.7(a).  His

6    argument fails in light of *Cross*'s holding that a pregnancy without medical complications that

7    resulted from unlawful intercourse can support an enhancement under § 12022.7(a).  The California

8    Supreme Court's interpretation of California law is binding in this federal habeas action.  *See Hicks*

9    *v. Feiock*, 485 U.S. 624, 629-30 (1988).  That is, this Court's analysis begins with an acceptance that

10   a pregnancy without medical complications that resulted from an unlawful but nonforcible

11   intercourse could support a finding of "great bodily injury" under California Penal Code §

12   12022.7(a).  *See Cross*, 45 Cal. 4th at 65-66.

13          Here, there was evidence of "physical injury and accompanying pain beyond that 'ordinarily

14   experienced'" by victims of lewd acts with minors.  *See Cross*, 45 Cal. 4th at 66.  Jane Doe had

15   become pregnant twice; the first pregnancy ended in August 2003 and the second pregnancy ended

16   in March 2004.  There was evidence that both pregnancies were experienced when she was 13 years

17   old at the time and was small in stature (i.e., under five feet tall and weighing about 110 pounds).

18   *See* RT 149.  Jane Doe had testified that she gained weight and vomited blood during the first

19   pregnancy.  RT 152.  Her mother testified that Jane Doe "became real sick" and was "throwing up a

20   lot" during the first pregnancy.  RT 70.  A rational trier of fact could have found that the first

21   pregnancy experienced by a smallish 13-year old who vomited blood and became real sick amounted

22   to a great bodily injury.  Jane Doe testified that she "got really sick," gained weight and had pains in

23   her stomach during the second pregnancy.  RT 177.  That pregnancy lasted at least 14 weeks.

24   *See* RT 246-247.  A rational trier of fact could have found that the second pregnancy experienced by

25   a smallish 13-year old who became really sick and had pain in her stomach amounted to a great

26   bodily injury.  The California Court of Appeal's rejection of the challenge to the sufficiency of the

27   evidence on the sentence enhancements was not an unreasonable application of *Jackson* and *Winship*

28   to the facts of the case.  *Juan H. v. Allen*, 408 F.3d at 1274-75.

3.     Instructional Error Regarding Unanimity

a.     Background

Bergara contends that he was denied due process because the trial court failed to *sua sponte* instruct the jury that jurors had to unanimously agree on the act constituting the great bodily injury. He argues that, without a unanimity requirement, the jurors could have relied on a legally improper theory to find the great bodily injury enhancement allegations true.

The trial court instructed the jury that if it found Bergara guilty of the lewd and lascivious conduct charged in counts 1 and 2, it had the duty to determine whether he personally inflicted great bodily injury on Jane Doe in the commission of those crimes. The instruction provided:

> If you find the defendant guilty of the crimes charged in Counts 1 and 2, it then will be your duty to determine whether the defendant *personally inflicted* great bodily injury on Jane Doe in the commission of that crime.
>
> "Great bodily injury" means a significant or substantial physical injury. The commission of the crime of Lewd and Lascivious Act on a Child Under 14 does not by itself constitute great bodily injury. Minor, trivial or moderate injuries, inherent in the crime of Lewd and Lascivious Act on a Child Under 14, do not constitute great bodily injury. However, if the amount of force used in the commission of the Lewd and Lascivious Act on a Child Under 14 resulted in a significant or substantial injury to any part of portion of the body, that injury constitutes great bodily injury.
>
> *A pregnancy or abortion may constitute great bodily injury.*
>
> The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true.

CT 281 (emphasis added).

In his closing argument, the prosecutor argued that jurors could rely on the abortion and/or the pregnancy to find a great bodily injury. RT 423-424. He argued that it was permissible for the jurors to split on the underlying factual determination – with some jurors relying on the abortion and some relying on the pregnancy – to find the great bodily injury enhancement true.

The California Court of Appeal rejected Bergara's claim that the failure to give a unanimity instruction was error. The state appellate court explained that the jury had to agree unanimously that the defendant was guilty of a specific crime, but that the unanimity requirement only applied to acts

11

1  that could be charged as separate offenses and not as to the theory as to how he committed that

2  crime.  Cal. Ct. App. Opinion, p. 11.

> [T]his jury was not required to agree on a theory underlying the finding supporting either enhancement.  For each of the great bodily injury enhancements, there was no room for disagreement that appellant's commission of a single lewd act by having sexual intercourse with Doe was the act by which he inflicted the injury.  An individual juror could determine that Doe's pregnancy or the abortion, or both, sufficed to fulfill the requirement of the injury being substantial or significant.  The unanimity requirement demands only that the jury unanimously find, as to each enhancement, that the injury sustained by Doe was significant or substantial.  (People v. Robbins (1989) 209 Cal.App.3d 261.)  Due process was served by the requirement that the jury render a unanimous verdict on each penalty enhancement provision, whether or not it agreed on the theory underlying that finding.

11  Cal. Ct. App. Opinion, p. 11.

12  In light of the later-decided case of *People v. Cross*, it now is evident that the California

13  Court of Appeal was wrong on the law when it stated that Bergara's jurors could determine that the

14  "pregnancy *or the abortion, or both*, sufficed to fulfill the requirement of the injury being substantial

15  or significant."  Cal. Ct. App. Opinion, p. 11 (emphasis added).  That court's decision was not the

16  last word on the claim, however, as Bergara's case went to the California Supreme Court.  The

17  California Supreme Court's dismissal of review in Bergara's case with a citation to California Rule

18  of Court 8.528(b)(1) was an indication that the California Supreme Court thought that Bergara's

19  conviction had been correctly upheld.  Its upholding of the Court of Appeal's decision did not

20  necessarily mean it approved the full reasoning of that decision.  *See* footnote 1, *supra*.  Because the

21  California Supreme Court had rejected abortion as a permissible basis for great bodily injury under

22  similar circumstances, it cannot be assumed that the Supreme Court overlooked the contrary analysis

23  by the California Court of Appeal in Bergara's case.  Instead, the most reasonable interpretation is

24  that the California Supreme Court upheld the lower court's decision in Bergara's case on a different

25  basis.  That basis is explained below.

26  ///

27  ///

28  ///

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b.     Analysis of Bergara's Federal Claim

This Court considers whether the California Supreme Court's unexplained rejection of Bergara's claim was contrary to or an unreasonable application of clearly established Supreme Court precedent.  When confronted with a summary denial – as is the situation here – the federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added).

Bergara had no right to a unanimity instruction as a matter of federal constitutional law. Criminal defendants in state court have no federal constitutional right to a unanimous jury verdict. *See Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (rule that jurors not required to agree upon single means of commission of crime applies equally to contention they must agree on one of alternative means of satisfying mental state element of crime); *Apodaca v. Oregon*, 406 U.S. 404, 410-12 (1972) (rejecting 6th Amendment right to jury trial challenge to 10-2 state jury verdict); *Johnson v. Louisiana*, 406 U.S. 356, 359-63 (1972) (rejecting due process challenge to 9-3 state jury verdict).

If the instruction had offered two legally correct alternatives – *i.e.*, if both the pregnancy and abortion could be relied on to find great bodily injury – Bergara's claim could be quickly rejected because Bergara had no federal due process right to a unanimous verdict and state law did not impose a unanimity requirement that he could rely upon to show a due process violation.  Bergara does not dispute that the state law unanimity requirement did not apply to the theory as to how a defendant committed a crime or as to how he had inflicted great bodily injury.  *See* Cal. Ct. App. Opinion, p. 11.

Notwithstanding the absence of any federal requirement of a unanimity instruction, this Court considers whether the given instruction violated due process because it contained an erroneous statement of law.  The instruction correctly stated that a pregnancy may constitute great bodily injury but incorrectly stated that an abortion may constitute great bodily injury in light of the

**United States District Court**

For the Northern District of California

1    absence of any evidence Bergara personally performed the abortion.  *See Cross*, 45 Cal. 4th at 66-

2    67.

3        When considering an allegedly erroneous jury instruction, a federal habeas court first

4    considers whether there was "constitutional error" in the challenged instruction.  *Calderon v.*

5    *Coleman*, 525 U.S. 141, 146 (1998).  To determine whether constitutional error occurred, a habeas

6    court asks: (1) whether there is a reasonable likelihood that the jury understood an assertedly

7    ambiguous instruction to mean what the defendant suggests it means; and (2) if so, "whether the

8    instruction, so understood, was unconstitutional as applied to the defendant."  *Id.* at 147 (explaining

9    test from *Boyde v. California*, 494 U.S. 370, 380 (1990)).  The foregoing test is only to determine

10   whether constitutional error has occurred; if constitutional error is found, the federal habeas court

11   also must determine whether that error was harmless by looking at the actual impact of the error.

12   *Coleman*, 525 U.S. at 146-147.  The habeas court must apply the harmless-error test set forth in

13   *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a "'substantial and

14   injurious effect or influence in determining the jury's verdict.'"  *Hedgpeth v. Pulido*, 555 U.S. 57, 58

15   (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623).

16       Here, it appears that the California Supreme Court's unexplained dismissal of Bergara's

17   petition was because it rejected Bergara's claim for the same reason it rejected the claim in *Cross*:

18   there may have been a mistake in the instruction, but it did not amount to a federal constitutional

19   violation.

20       *Cross* rejected an instructional error claim under facts very similar to those present here.  In

21   *Cross*, the jury had been instructed "that the pregnancy *or* the abortion could be great bodily injury."

22   *Cross*, 45 Cal. 4th at 63.[2]  Although an abortion may constitute great bodily injury in some

23   circumstances, there was no evidence that Cross had performed the abortion.  "For that reason the

24   modified instruction, insofar as it stated that an abortion can be great bodily injury, was an abstract

25   instruction, i.e., one which is correct in law but irrelevant. . . . Giving an instruction that is correct as

26   _____

27       [2]  The *Cross* jury was instructed with a version of CALJIC 17.20 (infliction of great bodily
     injury) that was modified to add these two sentences at the end: "A pregnancy *or* an abortion may

28   constitute great bodily injury.  You are the exclusive judges whether the defendant personally
     inflicted great bodily injury in this case."  45 Cal. 4th at 66.

**United States District Court**
For the Northern District of California

1   to the law but irrelevant or inapplicable is error. . . .   Nonetheless, giving an irrelevant or

2   inapplicable instruction is generally only a technical error which does not constitute ground for

3   reversal." 45 Cal. 4th at 67 (internal quotation marks and citations omitted).  Cross' jury also had

4   been instructed to disregard any instruction which applies to facts determined by the jury not to

5   exist.  *Id.*  Thus, the jury "would have understood that its duty was to determine not only whether

6   great bodily injury occurred but also whether . . . defendant 'personally' inflicted it." *Id.*  The

7   instruction did not suggest that the defendant's acts of facilitating the abortion by impregnating the

8   victim constituted personal infliction of the abortion.  *Id.*  Although the jury had not been instructed

9   on the meaning of the phrase "personally inflicts," there was no reasonable likelihood that the jury

10  understood the instruction to mean that defendant's acts of facilitating (but not performing) the

11  abortion satisfied the requirement that he personally inflict the great bodily injury.  *See id.* at 67-68.

12  The error of giving the factually inapplicable instruction that an abortion could be great bodily

13  injury "would not have misled a rational jury into concluding that by facilitating the abortion . . .

14  defendant personally performed the abortion; therefore, the error did not violate defendant's state or

15  federal constitutional rights."  *Id.* at 69.[3]  In short, the instruction error regarding abortion was

16  irrelevant in view of the rest of the instructions.

17      The instruction in Bergara's case that an abortion may constitute great bodily injury was

18  legally correct in theory but inapplicable to the facts of the case because there was no evidence that

19  Bergara had performed the abortion.  This was the same instructional error as in *Cross*.  *Cross*'s

20  finding that there was no constitutional error applies here as well.  As in *Cross*, Bergara's jury was

21  instructed to disregard any instruction which applies to facts determined by the jury not to exist.  *See*

22  CT 286.  The jury instruction in this case also stated that "a pregnancy or abortion may constitute

23  great bodily injury"; critically, it also required that the jury must determine "whether the defendant

24  *personally inflicted*" the great bodily injury.  CT 281 (emphasis added).  Thus, as in *Cross*, the jury

25  "would have understood that its duty was to determine not only whether great bodily injury occurred

26  _____

27      [3] That the *Cross* court was aware of the test for determining whether there was federal
    constitutional error can be determined by its citation to *Boyde* for the proposition that the defendant
28  "must demonstrate a reasonable likelihood that the jury understood the instruction in the way
    asserted by the defendant."  *Cross*, 45 Cal. 4th at 68.

United States District Court

For the Northern District of California

1  but also whether" Bergara "'personally' inflicted it." *Cross*, 45 Cal. 4th at 67.  The jury is presumed

2  to have followed the instructions given by the court.  *See Richardson v. Marsh*, 481 U.S. 200, 206-

3  07 (1987); *Francis v. Franklin*, 471 U.S. 307, 325 n.9 (1985).  As in *Cross*, there was no evidence

4  the defendant personally performed the abortion.

5       Accordingly, the California Supreme Court reasonably could have determined (as it did in

6  *Cross*) that the factually inapplicable instruction regarding abortion would not likely have misled a

7  rational jury into concluding that Bergara personally inflicted the abortion, and therefore there was

8  no federal constitutional error in Bergara's case.  Such a determination would not have been an

9  unreasonable application of, or contrary to, clearly established federal law, as set forth by the U.S.

10  Supreme Court.

11  B.    Sufficiency of Evidence on Count 6 – Furnishing Psilocybin to a Minor

12       Bergara contends that the evidence was insufficient to support his conviction on count 6,

13  furnishing psilocybin to a minor, *see* Cal. Health & Safety Code § 11380.[4]  Specifically, he contends

14  that there was insufficient evidence that he knew the nature and character of psilocybin (also known

15  as "magic mushrooms" and "'shrooms") as a controlled substance.

16       The California Court of Appeal explained that the § 11380 offense included as an element

17  "that the defendant knew the nature of the substance furnished as a controlled substance."  Cal. Ct.

18  App. Opinion, p. 15.

19              Our examination of the record finds substantial evidence to support
              the inference that appellant had knowledge that the substance he
20              furnished Doe in count 6 was psilocybin.  . . . Doe testified that when
              appellant furnished her with the mushrooms, he called them
21              "shrooms" and Sequiera testified that psilocybin was called "magic
              mushrooms" or "shrooms" by most users.  . . . Doe testified that as to
22              the mushrooms, appellant appeared to know what they were. . . .  Doe
              testified that the mushrooms in count 6 caused her to hallucinate and
23              Sequiera testified psilocybin causes the user to experience
              "hallucinations and feelings of euphoria." . . . [S]ufficient evidence to
24              support the inference that appellant knew the nature of the psilocybin

25  _____

26       [4]  "Every person 18 years of age or over who violates any provision of this chapter involving
    controlled substances . . . by the use of a minor as agent, who solicits, induces, encourages, or
27  intimidates any minor with the intent that the minor shall violate any provision of this article
    involving those controlled substances or who unlawfully furnishes, offers to furnish, or attempts to
28  furnish those controlled substances to a minor shall be punished by imprisonment in the state prison
    for a period of three, six, or nine years."  Cal. Health & Safety Code § 11380(a).

> furnished as a controlled substance is found in Doe's testimony that appellant called the mushrooms furnished "shrooms," her testimony that they caused her to hallucinate, and the expert testimony that the controlled substance psilocybin is called "shrooms" by users and that the substance causes one to hallucinate.

Cal. Ct. App. Opinion at 16-17.

As mentioned earlier, a federal court reviewing collaterally a state court conviction determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. at 319. A federal habeas court applies the standards of *Jackson* with an additional layer of deference under the AEDPA, generally asking whether the state court's decision reflected an unreasonable application of that test to the facts of this case. *See Juan H. v. Allen*, 408 F.3d at 1274-75.

The California Court of Appeal's rejection of Bergara's challenge to the sufficiency of the evidence was not contrary to, or an unreasonable application of, the *Jackson v. Virginia* test. California's Health and Safety Code has "lumped narcotics and restricted dangerous drugs together as 'controlled substances.' . . . Accordingly, what is now sometimes said to be required is knowledge of the 'controlled substance' character of the item. . . . All these terms, however, merely incorporate that list of drugs which the Legislature has declared to be 'narcotics,' 'restricted dangerous drugs,' or 'controlled substances' at any given time." *People v. Romero*, 55 Cal. App. 4th 147, 153 (Cal. Ct. App. 1997)*; see also People v. Coria*, 21 Cal. 4th 868, 871 (Cal. 1999) ("although defendant may be convicted of the crime without proof that he intended to violate the law, his knowledge of the character of the substance being manufactured is a prerequisite to a conviction" for manufacturing methamphetamine). The prosecution need not prove "knowledge of its chemical composition or its peculiar intoxicating powers." *Romero*, 55 Cal. App. 4th at 153. Nor need the prosecutor show that the defendant know the chemical name or precise chemical nature of the substance. *Id.* at 154 (citing *People v. Garringer*, 48 Cal. App. 3d 827, 835 (Cal. Ct. App. 1975).

There was ample evidence that Bergara was familiar with controlled substances and this controlled substance in particular. At Bergara's trial, Jane Doe testified about Bergara's drug-related activity. Jane Doe testified that Bergara shared methamphetamine with her, RT 201, gave

1    her ecstacy once, RT 241, and gave her "psychedelic mushrooms" or "magic mushrooms" once, RT

2    205. When he gave her the mushrooms, she took them and they made her hallucinate. RT 205.

3    Bergara did not consume mushrooms with her. RT 206. He called them "shrooms," RT 206, and

4    appeared to know what they were, RT 207, although he did not say anything when he gave the

5    mushrooms to her, RT 207, and she never saw him using mushrooms, RT 207. She did see him

6    using methamphetamines and marijuana, RT 207. The jury was informed that the defendant and

7    prosecution "stipulated that the defendant has knowledge of the nature and character of

8    methamphetamine as a controlled substance." RT 345.

9         Milpitas police detective Daryl Sequeira testified for the prosecution about controlled

10   substances. Sequeira testified that he had training in the "identification of various kinds of

11   controlled substance and narcotics" and in the "packaging and uses of various kinds of narcotics"

12   and mushrooms. RT 360. He also had on-the-job experiences with various controlled substances

13   and users of controlled substances. RT 361. He had seen people under the influence of drugs. RT

14   361. The controlled substance psilocybin is called "shrooms" or "magic mushrooms" on the street.

15   RT 365. The mushrooms are wild mushrooms that are dried and eaten. RT 365-366. They

16   reportedly taste "horrible." RT 366. The mushrooms have a chemical that is also a controlled

17   substance. RT 365. A person will experience hallucinations and feelings of euphoria after ingesting

18   these mushrooms. RT 365, 366.

19        There was evidence that psilocybin was a controlled substance, that its street names were

20   "magic mushrooms" and "shrooms" which caused hallucinations, and that the defendant referred to

21   the substance by its street name of "shrooms" when he gave it to Jane Doe. This was sufficient

22   evidence on which a rational jury could find that the prosecution had proven beyond a reasonable

23   doubt that the defendant knew that the substance he furnished was psilocybin, a controlled

24   substance. The California Court of Appeal's rejection of the challenge to the sufficiency of the

25   evidence on count 6 was not contrary to or an unreasonable application of the *Jackson v. Virginia*

26   standard.

27   ///

28   ///

18

**United States District Court**
For the Northern District of California

1    C.      Ineffective Assistance of Counsel – Failure to Request Instruction on Lesser Offenses

2            1.      Background

3            Bergara claims that his counsel provided ineffective assistance when he chose not to have the

4    jury instructed on non-forcible dissuading a witness as a lesser included offense of the felony charge

5    of dissuading a witness by force or threat of force.  Docket # 1, p. 16 of 24.

6            Bergara was charged with felony dissuading a witness under California Penal Code § 136.1.[5]

7    The crime of dissuading a witness generally is a misdemeanor but is elevated to a felony when "the

8    act is accompanied by force or by an express or implied threat of force or violence, upon a witness

9    or victim or any third person or the property of any victim, witness, or any third person."  Cal. Penal

10   Code § 136.1(c)(1).

11           At a mid-trial conference about jury instructions, defense counsel affirmatively requested

12   that the court *not* instruct the jury on the lesser offense of misdemeanor dissuading a witness.

13   Defense counsel first requested that the jury not be instructed on assault as a lesser included offense

14   to the lewd act counts because he had made a tactical decision not to request any lesser offense

15   instructions.  The court then said, "and that was because of the state of the evidence was such that

16   you felt you wouldn't have any credibility with the jury if you were to-well, maybe I shouldn't even

17   ask-because of your tactics."  RT 465.  Defense counsel responded, "Yes, your Honor.  I wasn't

18   planning on arguing a 240 lesser."  RT 465.  They next discussed a possible instruction defining the

19   lesser offense of misdemeanor dissuasion of a witness. Defense counsel told the court, "Same basis,

20   your Honor.  As a trial tactic, I don't think there was any – he either hit her and used force or he

21   didn't do it at all. That's our position."   RT 466.  During the closing argument, defense counsel

22   urged the jury that Jane Doe's testimony about witness intimidation was "the outer layer of that

23

24   ───────────────

25           [5] The crime of dissuading a witness is committed when one "[k]nowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial,

26   proceeding, or inquiry authorized by law," or "[k]nowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or

27   inquiry authorized by law."  Cal. Penal Code § 136.1(a)(1-2).  Even attempting the commission of the act makes one "guilty of the offense attempted without regard to success or failure of the attempt.  The fact that no person was injured physically, or in fact intimidated, shall be no defense

28   against any prosecution under this section."  *Id.* at § 136.1(d).

United States District Court

For the Northern District of California

1    snowball of lies that Jane Doe has told you in the case it gets more and more ridiculous as it goes. It

2    should be rejected." RT 447-48.

3    On appeal, Bergara argued that (a) the trial court should have *sua sponte* given an instruction

4    on the lesser offense of misdemeanor dissuading a witness and (2) if the failure to give such an

5    instruction was due to counsel's request, then counsel provided ineffective assistance.  The

6    California Court of Appeal rejected the argument that the trial court had a duty to *sua sponte* give

7    the instruction because, even if the misdemeanor was a lesser included offense and instruction

8    should have been given, any error was invited by counsel's request that the instruction not be given.

9    Cal. Ct. App. Opinion, p. 19.  The appellate court also emphatically rejected the ineffective

10   assistance of counsel claim.  In response to Bergara's argument that the jury could have discredited

11   Jane Doe's statement that he threatened force while at the same time crediting her statement that

12   Bergara told her to deny the relationship, the court wrote: "This is precisely the type of

13   second-guessing of trial counsel that we must not do." *Id.* at 20.  The court explained that reviewing

14   courts defer to counsel's reasonable tactical decision, accord a strong presumption that counsel's

15   conduct falls within a wide range of reasonable professional assistance, and will reverse only if the

16   record affirmatively discloses that counsel had no rational tactical purpose for his act or omission.

17   "Here, trial counsel made a tactical decision that he did not want the jury instructed on any lesser

18   included offenses, including that of misdemeanor intimidation of a witness.  His argument was that

19   Jane Doe was fabricating. There is nothing irrational about trial counsel choosing to argue that the

20   jury should not believe the prosecution's witness, and, as part of that strategy, forgo instructions on

21   lesser included offenses, especially for less serious counts." *Id.* at 20-21.

22   2.    Analysis of Federal Claim

23   The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective

24   assistance, of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The purpose of the

25   right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether

26   counsel's conduct so undermined the proper functioning of the adversarial process that the trial

27   cannot be relied on as having produced a just result." *Id.*  To prevail on an ineffective assistance of

28   counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," *i.e.*, his

United States District Court

For the Northern District of California

1    "representation fell below an objective standard of reasonableness" under prevailing professional

2    norms, *id.* at 687-88, and (2) prejudice flowed from counsel's performance, *i.e.*, that there is a

3    reasonable probability that, but for counsel's errors, the result of the proceedings would have been

4    different, *see id.* at 691-94.

5         Bergara was not deprived of effective assistance of counsel by counsel's failure to request an

6    instruction on misdemeanor dissuasion of a witness.  Bergara argues that counsel's strategic decision

7    should not be accorded any deference because counsel wrongly recalled the testimony in that he

8    thought the choice for the jury was that Bergara "either hit her and used force or he didn't do it at

9    all," RT 466, when there was no testimony that Bergara used force in connection with the dissuasion

10   of a witness.  Counsel's misrecollection appears to have stemmed from the fact that there was

11   testimony by Jane Doe that Bergara had hit her (although that testimony generally did not connect

12   the hitting with the dissuasion).  Counsel's misrecollection was immaterial because the felony of

13   witness dissuasion may be based on the use of force *or* threat of force to dissuade, and there was

14   evidence of threat of force.  Jane Doe testified that Bergara made statements threatening the use of

15   force when he asked her to deny their relationship: she testified that Bergara told her to say she

16   "didn't know anything;" that Bergara said that, if she "told on him," he "would hurt" her and her

17   family; and that these statements scared her.  *See* RT 186-187.  Jane Doe also testified that she first

18   felt afraid of Bergara "when he started to hit me and threaten that he was going to hurt me and my

19   family." RT 219.  The same all or nothing theory articulated by counsel – either the jury would

20   believe all or none of it – applied even if counsel incorrectly remembered that there was testimony

21   of actual force rather than of only threats of force.

22        Bergara's claim ultimately represents nothing more than a difference of opinion about the

23   best trial tactics, but that does not establish that he was denied effective assistance of counsel.

24   *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).  Defense counsel need not pursue every

25   nonfrivolous claim or defense, regardless of its merit, viability, or realistic chance of success.  *See*

26   *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420-22 (2009); *see id.* at 1419-20 (abandoning a defense

27   that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving

28   the defense); *see also McDowell v. Calderon*, 107 F.3d 1351, 1358 (9th Cir.) (no ineffective

21

United States District Court

For the Northern District of California

1   assistance where counsel's decision to concede guilt of felony murder but contest defendant's intent

2   to kill "best choice from a poor lot"), *amended*, 116 F.3d 364 (9th Cir.), *vacated in part by* 130 F.3d

3   833, 835 (9th Cir. 1997) (en banc).  Further, as the California Court of Appeal indicated, it was a

4   reasonable strategy for counsel to forgo instructions on lesser included offenses, especially for the

5   less serious counts.  Bergara has not shown that counsel's request that the jury not be instructed on

6   the lesser offense was deficient performance or that it resulted in any prejudice to him.[6]  The

7   California Court of Appeal's rejection of Bergara's claim was a reasonable application of *Strickland*.

8   Bergara is not entitled to the writ on this claim.

9   D.    Denial of Cross-Examination Regarding Probationary Status of Two Witnesses

10          Bergara contends that he was denied his Sixth Amendment right to confront witnesses when

11   the trial court prohibited the defense from impeaching two prosecution witnesses with evidence that

12   they were on probation when they spoke to the police and at the time of the trial.  Their probationary

13   status was admissible, he contends, because it could expose a possible motive to cooperate with

14   authorities and could impair witness credibility in a way that evidence of their convictions could not.

15          The trial court ruled *in limine* that Ms. A. (Jane Doe's mother) could be impeached with her

16   grand theft and elder fraud convictions, and that Annette H. (Jane Doe's aunt) could be impeached

17   with her petty theft conviction.  The court denied the defense request to impeach them with their

18   probationary status.  RT 20-21.  At trial, the witnesses were impeached with evidence of their

19   convictions and the jury was instructed on the proper use of this impeachment evidence.

20          The California Court of Appeal rejected the Confrontation Clause claim, concluding that this

21   was a reasonable and constitutionally permissible limitation on cross-examination under *Delaware*

22   *v. Van Arsdall*, 475 U.S. 673 (1986).  The state appellate court also distinguished on its facts the

23   case of *Davis v. Alaska*, 415 U.S. 308 (1974), in which the U.S. Supreme Court had  found a

24   Confrontation Clause violation based on a refusal to allow cross-examination about a witness's

---

26          [6]  The dissuading a witness conviction resulted in an 11-year sentence which is a serious

27   sentence but must be viewed in the context that it was 11 years of a sentence that totaled 108 years-to-life.  *See* Cal. Ct. App. Opinion, p. 27.  It was most unlikely that he would be acquitted of the

28   more serious charges – especially with the victim's testimony being corroborated by Bergara's love notes to her as well as by the DNA evidence that showed him to be the father of one fetus.

United States District Court

For the Northern District of California

1  probationary status as a juvenile delinquent.  The California Court of Appeal concluded that,

2  "[g]iven the insignificance of the probationary status of these witnesses to their motivations and the

3  admission of other impeachment evidence as to each witness, the trial court did not err in excluding

4  this evidence and there was no Confrontation Clause violation."  Cal. Ct. App. Opinion, p. 26.

5        The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

6  accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.

7  The right of confrontation includes a right to cross-examine witnesses.  A defendant meets his

8  burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have

9  received a significantly different impression of [a witness'] credibility had . . . counsel been

10  permitted to pursue his proposed line of cross-examination."  *Delaware v. Van Arsdall*, 475 U.S.

11  673, 680 (1986).  However, the Confrontation Clause does not prevent a trial judge from imposing

12  reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of

13  issues, witness safety or interrogation that is repetitive or only marginally relevant.  *Id*. at 679.  The

14  "'Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-

15  examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Id.*

16  *(quoting Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).  To determine whether a

17  criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of

18  evidence on cross-examination, a court inquires whether the evidence was relevant, whether there

19  were other legitimate interests outweighing the defendant's interests in presenting the evidence, and

20  whether the exclusion of evidence left the jury with sufficient information to assess the credibility of

21  the witness.  *United States v. Beardslee*, 197 F.3d 378, 383-84 (9th Cir.), *amended*, 204 F.3d 983

22  (9th Cir. 2000).

23        The California Court of Appeal's rejection of Bergara's claim was not contrary to or an

24  unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court.

25  The state appellate court correctly identified *Delaware v. Van Arsdall* as providing the controlling

26  law, and reasonably applied it in determining that the exclusion of the probation evidence was a

27  reasonable limit on cross-examination because its marginal probative value was outweighed by the

28  probability that its admission would create a substantial danger of undue prejudice.  Neither of these

United States District Court

For the Northern District of California

1   witnesses was crucial to the prosecution and neither of these witnesses professed to have seen

2   Bergara committing the crimes.

3        The state appellate court's determination that *Davis v. Alaska,* 415 U.S. 308 (1974), was

4   factually distinguishable was a reasonable application of that case.  In *Davis*, the defense wanted to

5   impeach a key prosecution witness with his probationary status as a juvenile delinquent in hopes of

6   showing not only that the witness made a hasty and faulty identification of petitioner to shift

7   suspicion away from himself as the robber, but also may have been subject to undue pressure from

8   police and made his identifications under fear of possible probation revocation.  *Id.* at 311.  The

9   *Davis* trial court relied on a state policy for confidentiality of juvenile records and barred any

10   reference to the witness' juvenile record without weighing the evidence to determine whether its

11   probative value warranted its admission.  *See id.* at 310.  As the California Court of Appeal

12   explained in Bergara's case, whereas the unimpeached witness in *Davis* possibly was the real

13   perpetrator of the crime, "[s]urely no one would argue that Ms. A. or Ms. H. sought to shift

14   suspicion away from themselves for these charges."  Cal. Ct. App. Opinion, p. 25.  Further, there

15   was "no suggestion that Ms. A. or Ms. H. were subject to undue pressure from the police to testify

16   against" Bergara.  *Id.*  The record reflected that "Ms. A. was suspicious of [Bergara's] behavior

17   around Doe long before the authorities were involved.  The motive to assist the prosecution here was

18   the protection of Ms. A.'s daughter and Ms. H.'s niece, rather than fear of possible probation

19   revocations."  *Id.*  Further, unlike the *Davis* witness, these two witnesses were impeached with their

20   actual convictions.  *Id.*  The California Court of Appeal also correctly noted that *Davis* did not

21   abandon the rule that a trial court could restrict cross-examination under well-established rules such

22   as that in California Evidence Code § 352, which allows evidence to be excluded if its probative

23   value "is substantially outweighed by the probability that its admission will (a) necessitate undue

24   consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or

25   of misleading the jury."

26        The state appellate court reasonably concluded that the exclusion of the evidence did not

27   violate Bergara's confrontation rights due to the "insignificance of the probationary status of these

28   witnesses to their motivations and the admission of other impeachment evidence as to each witness."

United States District Court
For the Northern District of California

1   Cal. Ct. App. Opinion, p. 26.  Bergara wanted to establish that the women had a "motivation for

2   coming forward or cooperating with the authorities, "  Docket # 1, p. 21 of 24, but he does not make

3   a convincing case that such impeachment would have helped him:  merely having a motive to do

4   one's civic duty is not the same as having a motive to lie about the defendant's actions.  The

5   probationary status of the witnesses would have been relevant to the potential bias of the witnesses,

6   although only marginally so.  The state had a legitimate interest in excluding this evidence that was

7   of low probative value and was outweighed by the probability that it would create a substantial

8   danger of undue prejudice.  The case did not turn on these two witnesses' credibility, and neither

9   was an eyewitness to the crimes with which Bergara was charged.  Lastly, even with the exclusion

10  of the evidence that these witnesses were on probation, the jury was left with enough information to

11  properly assess the credibility of the witnesses from the evidence of their familial relationship with

12  the victim and their prior convictions.  Although he may not have been able to do a cross-

13  examination that was "effective in whatever way, and to whatever extent" he wanted, Bergara did

14  have "an *opportunity* for effective cross-examination," and that fulfilled his Confrontation Clause

15  rights.  *Delaware v. Van Arsdall*, 475 U.S. at 679.  He is not entitled to the writ on this claim.

16  E.       A Certificate of Appealability Will Issue as to Only One Claim

17          Petitioner has "made a substantial showing of the denial of a constitutional right," 28 U.S.C.

18  § 2253(c)(2), and reasonable jurists would find debatable the district court's assessment of

19  petitioner's claim that the absence of a unanimity instruction deprived him of his right to due

20  process because it allowed conviction on a legally incorrect theory.  *See Slack v. McDaniel*, 529 U.S.

21  473, 484 (2000).  Accordingly, a certificate of appealability is GRANTED on that claim.  The

22  certificate of appealability is DENIED as to all the other claims in the petition because, as to those

23  claims,

24  ///

25  ///

26  ///

27  ///

28  ///

petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. §
2253(c)(2).  Petitioner is cautioned that the Court's ruling on the certificate of appealability does not
relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

### VII.   CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits.  The Clerk shall close the
file.


IT IS SO ORDERED.


Dated:  December 28, 2011

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California

26